**SAUL EWING LLP**
*A Delaware LLP*
By:    Michael Lampert, Esquire
        ML-1064
750 College Road East
Princeton, New Jersey 08540
(609) 452-3100
Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Anthony H. N. Schnelling, as Trustee of the Impath Bankruptcy Liquidating Trust,<br><br>           Plaintiff,<br><br><br>vs.<br><br>KPMG LLP,<br><br>           Defendant. | CIVIL ACTION NO. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony H. N. Schnelling, as Trustee of the Impath Bankruptcy Liquidating Trust (the "Liquidating Trust" and the "Trustee"), by and through his undersigned attorneys, alleges the following claims against KPMG LLP ("KPMG"). The claims are based upon facts obtained through interviews, review of public filings and documents located within the files of Impath, Inc. ("Impath" or the "company"):

### INTRODUCTION

1. On March 28, 2005, the United States Bankruptcy Court for the Southern District of New York, following auction sales of all Impath's assets, confirmed a liquidating Plan of Reorganization for Impath (the "Plan") pursuant to which creditors were paid in full and a Liquidating Trust was established for the benefit of shareholders, including shareholders who

were parties to a class action settlement between Impath and third parties other than KPMG (the "Class Action Settlement" and the "Shareholders"). Pursuant to the Plan and Class Action Settlement, the claims of the Shareholders against KPMG and the claims of Impath against KPMG were assigned to the Liquidating Trust. The Plan became effective on July 22, 2005, following entry of an Order of the District Court, dated June 8, 2005, approving the Class Action Settlement. This complaint now seeks recovery from KPMG on behalf of Impath and on the assigned claims of the Shareholders.

2.      The claims against KPMG arise out of KPMG's failure to follow professional standards in its audits and reviews of Impath's financial statements and its intentional and/or reckless disregard of accounting practices that caused an artificial inflation of Impath's stock price while, at the same time, substantially impairing the value of Impath's business and ultimately causing the liquidation of its assets in bankruptcy proceedings.

## SUMMARY OF OPERATIVE FACTS

3.      On July 30, 2003, Impath announced that the Audit Committee of the Board of Directors had initiated an investigation into possible accounting irregularities. The announcement promptly followed the disclosure to the Audit Committee of information suggesting that the company's financial statements were materially misstated. A review conducted under the supervision of the Audit Committee revealed that during a period from 1999 through March 2003 the company had been the victim of accounting irregularities perpetrated by, among others, two former members of the KPMG audit team who joined Impath's accounting and financial reporting staff (the "Former KPMG Auditors"). The Former KPMG Auditors, together with two other former Impath employees, have pleaded guilty to federal securities fraud. In addition, two other senior officers, Anu Saad (the former Chief Executive

Officer) and Richard Adelson (the former Chief Operating Officer) have been indicted. (Collectively, the indicted and convicted individuals are referred to as the "Impath Criminal Defendants.")

4.      Impath's review of its accounting practices revealed the necessity to adjust by approximately $148 million the net income reported in Impath's financial statements during the period of 1999 through 2002. The extent of the misstatements in Impath's reported financial results grew significantly each year after the Former KPMG Auditors joined the company and booked an increasing number of unsupported and fictitious journal entries to the company's books and records.

5.      As detailed below, KPMG disregarded a series of "red flags" during the 1999 through 2003 period that should have put KPMG on notice of the extreme and flagrant disregard of Generally Accepted Accounting Principles ("GAAP") that caused the material misstatement of Impath's financial results.

6.      Specifically, KPMG ignored the significant problems with the automated accounts receivable system which it had created for Impath and for which it had been paid $2.6 million to create. Most critically, although nominally automated, the system required the manual input of journal entries, which created an opportunity for individuals to book phony revenue and expense entries. The Former KPMG Auditors took full advantage of the flawed system by posting numerous fictitious journal entries to the company's general ledger. Even a superficial review of the general ledger by KPMG would have identified clearly irregular manual entries such as those marked "per P.T. adjustments," which entries were created by one of the Former KPMG Auditors, Peter Torres, to artificially inflate revenue and reduce expenses.

7.     Similarly, KPMG ignored the fact that accounts receivable recorded in the KPMG-created system did not accurately represent the realization rates that Impath could expect for health-care services performed by the company.  For example, Impath recorded a value for services performed, without providing an adequate valuation reserve, even when Impath was bound by contracts to insurance companies and hospitals to bill at significantly lower rates.

8.     The Impath Criminal Defendants did not act in the best interests of the company and instead sought to line their own pockets with cash and other lucrative benefits.  In particular, the KPMG Former Auditors sought to curry favor with the more senior executives of the company who have now either been indicted or pleaded guilty to securities fraud charges and whose executive compensation at Impath was based largely on the ability to meet or exceed budgeted earnings targets.

9.     KPMG's failure to warn Impath's Board of Directors of the accounting improprieties destroyed Impath's ability to develop its business and increase its long-term profitability.  As a consequence, Impath suffered a substantial decrease in the value of its business and ultimately filed for bankruptcy protection.  At the same time, the accounting misstatements included in Impath's filings with the Securities and Exchange Commission (the "SEC") falsely inflated the price of the stock purchased by the Shareholders during the period in which the accounting irregularities were concealed from the investing public.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the Trustee's claim against KPMG asserted in the First Cause of Action below pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 & 1337.  This Court has supplemental jurisdiction over the state law claims against KPMG asserted in the Second, Third and Fourth Causes of Action below pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as KPMG transacts business in this District and many of the acts and practices complained of herein occurred in this District.  In particular, the KPMG auditors who serviced the Impath account were primarily based in the Short Hills, New Jersey office of that firm and the audit opinions at issue in this litigation were issued by that office.

## PARTIES

12.     Plaintiff Anthony H. N. Schnelling is the Trustee of the Liquidating Trust, which trust was assigned Impath's claims, as well as the Shareholders' claims against KPMG pursuant to the Third Amended Joint Plan of Liquidation, which was approved by the United States Bankruptcy Court for the Southern District of New York on March 21, 2005, and pursuant to a Stipulation of Settlement settling a class action filed on behalf of the Shareholders of Impath, which was approved by the United States District Court for the Southern District of New York on June 8, 2005.

13.     Defendant KPMG is a limited liability partnership of certified public accountants registered to do business and doing business in the state of New Jersey. Specifically, KPMG maintains an office in Short Hills, New Jersey, which office serviced the Impath account.

## FACTS

### Impath

14.     Prior to the disclosure of accounting issues, Impath was one of the fastest growing biotechnology companies in the country.  Magazines such as Fortune and Forbes listed Impath as one of the best and most dynamic small companies in the country.

15.     Impath engaged in three lines of business.  The Physician Services ("IPS") business was a laboratory testing operation that utilized the company's proprietary software to augment traditional laboratory services used to make cancer diagnoses.  The Predictive Oncology ("IPO") business assisted pharmaceutical companies in their assessment of the efficacy of drug therapies.  The Information Services ("IIS") business included an enterprise resource planning software package specifically designed for hospitals, laboratories, and others providing pathology services.

### KPMG's Engagements to Audit and Review Impath's Financial Statements

16.     As a public company trading on the NASDAQ, Impath was required to file its annual reports on Form 10-K with the SEC.  Pursuant to SEC Regulation S-X, these annual reports must contain financial statements audited by independent accountants.  The SEC regulations require that financial statements filed with the SEC be presented fairly and in conformity with GAAP.

17.     Impath engaged KPMG to conduct independent audits of Impath's annual consolidated financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") and, based on those audits, to issue opinions as to whether Impath's annual consolidated financial statements were presented fairly, in all material respects, in conformity with GAAP.  When KPMG agreed to perform its independent audits of Impath's financial statements, it knew that the financial statements, as well as KPMG's audit opinions, would be publicly disclosed in the SEC filings.

18.     KPMG had audited Impath's annual financial statements since the company's initial public offering of stock in 1996.  KPMG's engagement letters each year during the fiscal years 1999 through 2002 were substantially the same, stating in pertinent part that "we

will conduct the audit in accordance with auditing standards generally accepted in the United States of America...."

19.     Each year, KPMG issued its audit report to Impath's Board of Directors with respect to its audits of Impath's annual consolidated financial statements for fiscal years 1999 through 2002. In those audit reports, KPMG specifically represented: "[w]e conducted our audit in accordance with generally accepted auditing standards" or "[w]e conducted our audits in accordance with auditing standards generally accepted in the United States of America." KPMG also stated its opinion that, based on its audits, Impath's annual consolidated financial statements for fiscal years 1999 through 2002 were presented fairly in all material respects, in conformity with GAAP.

20.     As discussed below, KPMG did not conduct its audits of Impath's annual consolidated financial statements for fiscal years 1999 through 2002 in accordance with GAAS. Contrary to the express opinion of KPMG, the financial statements were not presented fairly in all material respects or in conformity with GAAP.

21.     From 1999 through March 2003, Impath also engaged KPMG to review its quarterly financial statements. Each year the engagement letter stated in substance that "we will conduct our reviews in accordance with the professional standards set forth in Statement on Auditing Standards No. 71 issued by the American Institute of Certified Public Accountants."

22.     The quarterly financial statements that were reviewed by KPMG were included in Impath's quarterly reports on Form 10-Q filed with the SEC. When KPMG agreed to perform its quarterly reviews, it knew that the quarterly financial statements would be publicly disclosed in the SEC filings.

23.     As discussed below, KPMG did not conduct its reviews of Impath's financial statements in accordance with professional standards.

24.     In 2002, KPMG collected $318,000 in fees in connection with its performance of audits and quarterly reviews of Impath's financial statements.  In 2001, KPMG received $195,000 in audit fees and in 2000, KPMG received $160,000 in audit fees.

## KPMG's Relationship with Impath Extended Beyond the Role of Auditor

25.     In addition to the performance of audit services, KPMG was retained to perform a variety of tax preparation and consulting services for Impath.  KPMG was paid well for its engagements.  In addition to the fees it received for its audits and quarterly reviews of Impath's financial statements, KPMG was paid $1.1 million in non-audit related fees from 2000 through 2002.

26.     In 1998, KPMG worked as a consultant for Impath to create an accounts receivable reporting system.  This system became known as the "Impulse" system.  The Impulse system was intended to track the receipt and testing of medical specimens (i.e., either tissue or body fluids sent in for evaluation), to generate invoices for services rendered relating to the specimens, to record payment on the invoices and to track revenues.  However, as KPMG was aware, the Impulse system was deficient and contributed to the improper reporting of Impath's accounts receivable during the relevant time period.  KPMG collected fees of more than $2.6 million in connection with the development of the Impulse system.

27.     In addition, the central participants in the accounting improprieties were the Former KPMG Auditors who, prior to joining Impath, had been assigned to the Impath account.  Peter Torres was an auditor assigned by KPMG to the Impath account.  Immediately after the termination of his employment with KPMG in 1999, Torres became the Controller of

Impath.  From January 2002 through July 2003, Torres served as Impath's Vice President of Finance.  By his own design and with the implicit consent of KPMG, Torres was the principal individual at Impath who had contact with KPMG in connection with KPMG's audits and reviews of Impath's financial statements.

28.     On March 24, 2005, Torres entered a guilty plea to charges of conspiracy, securities fraud, bank fraud and making false filings to the SEC.

29.     Karin Gardner was another Former KPMG Auditor assigned to the Impath account.  Immediately after the termination of her employment with KPMG, Gardner became an Assistant Controller at Impath.  From December 2002 until July 2003, Gardner also served as Impath's Controller.

30.     On March 24, 2005, Gardner entered a guilty plea to charges of conspiracy, securities fraud, bank fraud and making false filings with the SEC.

31.     Throughout the relevant period of their employment at Impath, Torres and Gardner maintained a social relationship outside of the office with members of the KPMG audit team assigned to the Impath account.

### Discovery of KPMG's Failures

32.     During the period of 1999 through March 2003, Corey Temple was the KPMG engagement partner assigned to the Impath account.  At no time did Temple bring the material misstatements in the company's financial statements to the attention of Impath's Board of Directors or Audit Committee.

33.     The accounting irregularities were readily subject to discovery by an audit team performing steps in accordance with GAAS.  In April 2003, KPMG assigned a new engagement partner, Michael Monteleone, to the Impath account.  Within only a few months, by

July 2003, the material misstatements in Impath's financial statements were uncovered by Monteleone and others working with him and brought to the attention of the Audit Committee.

34.     Promptly after the accounting irregularities were brought to the attention of the Audit Committee, the committee took swift and decisive action.

35.     On July 30, 2003, Impath issued a press release and Form 8-K which stated in part:

> IMPATH Inc. (Nasdaq NM: IMPH) today announced that the Audit Committee of the Company has initiated an investigation into possible accounting irregularities involving its accounts receivable which the Company believes have been overstated. The Company noted that given the preliminary stage of the investigation, it cannot determine the financial impact but believes that it will be material. Because of the investigation, investors should not rely on the consolidated financial statements or the independent auditors reports, where applicable, contained in the Company's previously filed periodic reports, including those set forth in the Company's Annual Reports on Form 10-K for 2002 and prior periods, and the most recently filed Quarterly Report on Form 10-Q for the period ended March 31, 2003. In addition, in the process of the Company's review of the carrying value of its GeneBank(TM) asset, the Company discovered discrepancies relating to the amounts capitalized to date on this asset. This investigation will likely lead to a restatement of results from prior periods and prior years, and the continued evaluation of assets may result in one-time charges for the second quarter, contributing to an overall net loss for the year. The Audit Committee intends to retain independent counsel and an independent forensic accounting group to conduct the investigation.

36.     The accounting issues had the following quantitative impact on Impath's reported net accounts receivable (which had a dollar for dollar impact on net revenue) and pre-tax net income:

| (amounts in millions) | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| **Accounts receivable, net** | | | | |
| Original Form 10-K | $35.5 | $50.7 | $63.6 | $69.0 |
| Adjusted amount | $25.2 | $35.9 | $39.5 | $26.9 |

| | | | | |
|---|---|---|---|---|
| Percentage difference | 28% | 29% | 38% | 61% |

**Income (loss) before taxes**

| | | | | |
|---|---|---|---|---|
| Original Form 10-K | $13.7 | $22.7 | $19.5 | $18.4 |
| Adjusted amount | ($0.8) | $8.4 | ($11.8) | ($14.4) |

Thus, the total income before taxes was overstated by $92.9 million over the 1999 through 2002 time period.

37.     Trading of Impath stock was halted in response to the July 30, 2003 announcement and when trading resumed, the price of the stock declined precipitously.  On July 29, 2003, immediately prior to the press release, Impath stock closed at $18.09 per share.  On the day trading resumed, August 28, 2003, the stock closed at $2.15 per share.

38.     In addition, the disclosure of the misstated financial statements caused immediate and substantial harm to Impath.  The company's bank lenders immediately declared a default and prevented further access to the bank facility.  As a result, the company and its subsidiaries did not have sufficient funds to meet their obligations and to cover their operating expenses and had no choice except to seek protection pursuant to Chapter 11 of the U. S. Bankruptcy Code.  In connection with the bankruptcy case, the company incurred more than $20 million in professional fees and other expenses.

39.     The commencement of Chapter 11 proceedings led to the sale of Impath's core business to Genzyme for approximately $215 million, and the sale of its other operating units for approximately $25 million.  As a result, the market value of the assets sold through the bankruptcy auction process was materially less than it would have been had the fraud not occurred.

### Violations of Generally Accepted Accounting Principles ("GAAP")

40.     GAAP represents conventions, rules, and procedures that define accepted accounting practices at a particular time.  GAAP constitutes the authoritative standards for preparing and presenting information in financial statements.  Currently, GAAP is primarily established by the Financial Accounting Standards Boards ("FASB"), a privately-funded institution, and also by the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants ("AICPA").  The FASB formulates Statements of Financial Accounting Standards ("SFAS").  Both the SEC and AICPA have recognized FASB's statements and interpretations as authoritative sources of GAAP.  Before the FASB began issuing standards, GAAP was established by the Accounting Principles Board ("APB") of the AICPA.

41.     Impath's annual consolidated financial statements for fiscal years 1999 through 2002 and Impath's quarterly consolidated financial information from 1999 through March 2003 were materially misstated due to egregious violations of GAAP.  Those financial statements grossly inflated the revenue and earnings of Impath.  None of this was known to a majority of Impath's Board of Directors, including in particular the members of the Audit Committee, which directors relied on the audit opinions and review reports of KPMG for their understanding that the consolidated financial statements of Impath during the 1999 through March 2003 period were fairly stated.  The Board of Directors included a number of well-respected individuals, such as George Frazza (the former General Counsel of Johnson & Johnson), Robert Campbell (former Vice President of Johnson & Johnson), Joseph Mollica (the former President and CEO of DuPont Merck Corp.), who would have taken prompt action to correct the improprieties had those issues been brought to their attention.

42.     The most significant misstatement occurred in three areas: (i) accounts receivable, (ii) intangible assets, and (iii) physical inventory, which are each summarized below.

**Impath's Accounts Receivable**

43.     IPS was an operating unit of Impath.  It performed laboratory procedures on cancer specimens and was Impath's largest operating unit, often accounting for more than 80% of Impath's reported revenue.

44.     In 1999, Impath began using the Impulse system to monitor and record all testing and billing activity for each cancer specimen received by IPS.

45.     KPMG was hired to create Impulse.  From the start, KPMG was aware that the system did not properly account for Impath's accounts receivable.  Despite knowledge of this deficiency, KPMG failed to ensure that the company accurately reported its accounts receivable balance in each subsequent period.

46.     Each specimen received for testing was referred to as a "case."  Among the ways used to track cases was "cases received" and "cases billed."  Each specimen received at a laboratory was referred to as a "case received."  Each case for which Impath issued a bill to a customer was referred to as a "case billed."  Impath billed the cost of the testing to a third-party payor such as Medicare, the insurance company, the hospital or other institution, or the patient.

47.     After the tests were performed, Impulse automatically issued an invoice, but the Impulse system did not interface with the general ledger, which was the source of the company's financial statements.  Thus, to record revenue and accounts receivable in the general ledger, the accounting staff manually posted journal entries to the general ledger.  This deficiency in the internal control system -- specifically, the manual intervention necessary to

reconcile the Impulse entries to the general ledger -- created an environment that was conducive to misconduct.

48.     During the relevant period, certain Impath employees manipulated IPS' revenue and accounts receivable within the general ledger to match the projections that management had provided to the Board.  These employees, primarily Former KPMG Auditors Peter Torres and Karin Gardner, simply "plugged" millions of dollars of fictitious revenue and accounts receivable into the general ledger without any support.  Torres and Gardner prepared phony "topside" journal entries in the requisite amounts and provided them to their clerical staff for posting without any back-up documentation.  Topside adjustments are prepared by management-level personnel and alter a company's financial results after the normal accounting procedures of a company are completed.

49.     Torres and Gardner were especially knowledgeable about Impulse's vulnerabilities – and about the inability of Impath to detect misconduct that was ignored by KPMG – because of their experience as Former KPMG Auditors, as well as their senior positions in Impath's accounting function.

50.     These unsupported topside adjustments were made by Impath financial reporting personnel, particularly Torres, in 1999 through March 2003 time period without detection or disclosure by KPMG.  The topside adjustments were material and constituted egregious departures from GAAP.  The topside adjustments violated one of the most basic premises of GAAP: to be recognized and recorded on financial statements, revenues and expenses must be reliable and represent actual or expected cash inflows or outflows that have occurred or will eventuate.

51.     The discrepancies between the accounts receivable reported on the

Impulse system and in the detailed general ledger grew progressively larger each quarter.  By the

fourth quarter of the fiscal year ended December 31, 2002, the unsupported topside entries made

under the direction of Torres totaled $24.2 million and accounted for approximately 50% of the

revenue recorded in that quarter.

52.     The Impulse system created by KPMG also improperly accounted for

certain contractual allowances, resulting in additional overstated revenue.  Impath had

agreements with various hospitals and insurance companies, which used Impath's health-care

services, that those entities would not be required to pay 100% of the cost of services billed by

Impath.  Instead, a reimbursement rate would be paid, which equaled a percentage of Impath's

standard billing rates.

53.     The Impulse system failed to recognize the implications of these

contractual relationships to Impath's financial reporting.  To illustrate, if Impath provided

services that would be billed at $100, often, due to the various agreements it had entered with

hospitals and insurance companies, it would never receive a full $100 payment for those

services.  If those $100 worth of services were to be paid for by a particular insurance carrier,

Impath might only be contractually entitled to receive $50 from the insurance company.  If those

same $100 worth of services were to be paid for by a particular hospital, Impath might only be

contractually entitled to $60.  However, the net accounts receivable balance recorded by Impath

in the Impulse system was not adjusted to correspond to the contractual reimbursement rate

agreed upon by the particular insurance company or hospital billed.

54.     Moreover, at the same time that Impath's internal revenue recognition

practices did not account for the realities of Impath's contracts, the company was publicly stating

that its revenue recognition practice did account for the reduced reimbursement contracts it had with various payors and healthcare service providers. By way of example, in its 2001 Form 10-K filed with the SEC, Impath stated, "Revenue is reported at the estimated net realized amounts from patients, third-party and government payors, and others for services rendered, including estimated retroactive adjustments under reimbursement agreements with certain payors." This statement was not true.

55.     In addition, in or about early 2001, at the direction of one of the Impath Criminal Defendants, Impath changed its revenue recognition practices. Specifically, Impath started to record revenue based on "cases received" as opposed to "cases billed." However, certain of the "cases received" were never actually billed to clients or the services were never performed. Thus, there was never any intention to collect fees on these cases. For example, Impath provided discounts and free testing services to customers who provided care in the areas of lymphoma and leukemia as part of a plan to increase Impath's market share in those areas. Nevertheless, Impulse would record these essentially free services as accounts receivable.

56.     This change in recording revenue was not publicly disclosed, and, in fact, was inconsistent with statements made in Impath's public filings. Thus, in its 2001 Form 10-K filed with the SEC, Impath stated, "The Company generally recognizes revenue for services rendered upon completion of the testing process." This statement was not true.

57.     The inflated income figures were reflected in Impath's Form 10-Q's filed with the SEC and in the notes to the annual consolidated financial statements included in Impath's Form 10-Ks filed with the SEC. Impath's accounts receivable were overstated in these SEC filings by over $90 million during fiscal years 1999 through 2002.

## GeneBank Intangible Assets

58.     The IPO operating unit consisted of several different businesses that provided resources designed to assist pharmaceutical companies in the development of cancer treatments.  One of IPO's principal assets was "GeneBank," a repository of thousands of tumor tissues, other biological specimens and clinical follow-up information.

59.     GeneBank stored solid cancer tumors and tissues in a repository. Originally, GeneBank's goal was to contribute to the efficient discovery of novel types of cancer in patients by collecting tumor tissues and clinical information throughout the United States and the world.  Impath planned on testing their collections and storing the results in a data archive. The goal was for this data to be sold to clinicians throughout the country to help them identify particular forms of cancer in their patients.

60.     The GeneBank account's tumor tissues were classified on Impath's balance sheet as an intangible asset, which was amortized on a straight-line basis over a seven-year period.  Originally, under GAAP, it was permissible for IPO to capitalize (i.e., record as an asset) the cost of tissue purchases because the tissues were an asset that had economic value for a period of time that extended beyond the accounting period in which they were acquired.  The cost of such assets is amortized by recording a proportionate amount of the total cost as an expense on the income statement for each accounting period within the useful life of the asset.

61.     The original plan for GeneBank, however, did not materialize.  Instead, GeneBank began selling actual specimens from the tumor samples in its repository.  As the specimens were sold off, GeneBank's inventory of cancer tumors diminished.  Impath's accounting for the GeneBank tumors should have been reclassified from an intangible asset to an

asset held for sale to be valued at the lower of cost or market, consistent with Impath's policy for recording inventory. GeneBank's tissues were not reclassified.

62.    Also under GAAP, ordinary operating expenses, such as salaries and office supplies, should not be capitalized as expenses and must instead be recorded as expenses in their entirety on the income statement in the period in which they are incurred.

63.    Nevertheless, Torres and Gardner routinely capitalized ordinary operating expenses, falsely recording them as tissue purchases. These individuals also prepared fictitious and unsupported journal entries to increase the value of the intangible assets account and to defer the recognition of expenses.

64.    From 2001 through 2003, Impath capitalized a total of $19.4 million in GeneBank expenditures: $5 million in the fiscal year ended December 31, 2001, $13.3 million in 2002, and $1.1 million in the first quarter of 2003. These amounts appeared as intangible assets on the balance sheet and were described in Impath's annual report on Form 10-K for fiscal year 2002 as "[p]ayments to acquire tissue and tumor samples for use in GeneBank." In truth, IPO spent less than $3.5 million on actual tissue purchases during the entire 1999 through 2002 period. The other roughly $16 million included ordinary operating expenses such as employee benefits, lab supplies, promotional materials, maintenance costs, office supplies, and software or was the result of a fabrication of receivables and bad debt entries. Some of these items did not even relate to GeneBank or to the IPO unit.

65.    In all, as a result of the improper capitalization of operating expenses described above, Impath's net income as reported in the company's filings with the SEC was overstated by $2.8 million for 2001 and $5.7 million for 2002. The improper capitalization of

operating expenses also resulted in an overstatement of Impath's net intangible assets by $5 million as of December 31, 2001 and $14.7 million as of December 31, 2002.

### Physical Inventory

66.    Impath's physical inventory consisted largely of laboratory supplies located in seven locations.  The physical inventory located in the New York, California and Massachusetts locations was managed by an accounting system, which was under the control of Torres and Gardner.  The company's physical inventory for these three locations was materially overstated in two ways.

67.    First, as with the GeneBank account, numerous ordinary operating expenses, such as travel, salaries, and benefits, were routinely capitalized by certain Impath Criminal Defendants and included in the inventory account on the balance sheet.  Under GAAP, these ordinary operating expenses should not be capitalized and must instead be recorded as expenses in their entirety on the income statement in the period in which they are incurred.

68.    Second, during the relevant period, Torres and Gardner inflated the inventory accounts by preparing fictitious journal entries lacking any back-up documentation.

69.    As a result of the improper capitalization of operating expenses and fictitious journal entries described above, inventory was overstated in the company's financial statements included in its public SEC filings by a total of $10.8 million of the $18.2 million included in that account as of December 31, 2002.

### Capitalization of Impulse and PowerPath Software Expenses

70.    Statement of Position 98-1 entitled "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use," requires the acceleration of the write-off of undepreciated capitalized software that will no longer be utilized by a company.

71.     In 1998, Impath engaged KPMG to develop the Impulse system, as an invoicing and accounts receivable system to manage its clinical opportunities, and to develop a billing software package to more effectively manage the growth of the business.

72.     The first generation of billing software was deployed in early January 1999.  Severe deficiencies in the billing software led to the deployment in April 2001 of a second generation of billing software.  Continued deficiencies in the billing software led to the deployment of yet a third generation of billing software in April 2003.

73.     The costs relating to the development of the first and second generations of the software billing system should have been fully depreciated in the period prior to the implementation of the next generation of software billing system.  Impath did not make these adjustments.

74.     As a result, Impath failed to record an additional depreciation charge of $3.7 million in 2000 and at least $500,000 in 2002.

## The Motive for the Wrongful Conduct

75.     In manipulating the financial reporting in order to meet targeted budgets and maximize their receipt of incentive based compensation, the Impath Criminal Defendants sought to enrich themselves to the detriment of Impath and its shareholders.

76.     In addition, Saad, Adelson and Cammarata actually misappropriated approximately $851,000 in funds to pay for costs they incurred in exercising stock options in 2001 and 2002.  The stock options granted by Impath permitted the officers to purchase a specified number of shares of stock at a specified stock price.  Pursuant to the stock option plan, the executives were required to pay Impath the price to exercise the options.  Instead of using their own funds, these individuals used corporate funds.

77.     In addition, Saad was terminated by Impath due to the misappropriation of approximately $250,000 in corporate funds.  The misappropriation of funds occurred through the use of a corporate credit card to pay for personal expenses, including vacations, furniture, country club dues, beauty products, jewelry and art work.

78.     Saad and Cammarata also received unauthorized advances on their performance bonuses that were not deducted from the actual bonus payments.

79.     Compensation for Impath's executives was based, among other things, on the ability to meet or exceed budgeted earnings targets.  As a result, executives received significant compensation as a result of the company's inflated financial results.  The executives received performance bonuses, stock options and other compensation based upon the false financial position that Impath reported.  Moreover, the executives were able to exercise stock options at inflated prices.

80.     By falsely inflating Impath's earnings and making it appear that Impath had met budgeted goals, the Impath Criminal Defendants were able to keep their executive positions, obtain significant bonuses, increase their salaries and increase the value of their stock and stock options.  The Impath Criminal Defendants capitalized on the inflated value of Impath's stock by exercising certain stock options they held.  For example, certain Impath executives received the following realized values upon exercising their options:

|  | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Anu Saad | $983,000 | --- | $1.85 million | --- |
| Rich Adelson | $44,000 | $1.27 million | $903,000 | $334,000 |
| David Cammarata | --- | $1.3 million | $554,000 | --- |

81.     Similarly, since 1999, Saad, Adelson and Cammarata received significant performance bonuses, including the following:

|                  | 1999      | 2000      | 2001      | Total     |
|------------------|-----------|-----------|-----------|-----------|
| Anu Saad         | $180,000  | $237,500  | $294,500  | $712,000  |
| Rich Adelson     | $132,000  | $118,750  | $152,000  | $402,750  |
| David Cammarata  | $30,000   | $60,000   | $90,000   | $180,000  |

82.     Other executives also capitalized on Impath's reported financial statements by obtaining stock options and obtaining performance bonuses. Peter Torres, for example, was granted 61,000 shares of Impath stock in stock options from 1999 through 2002, and sold shares that were acquired by exercising these options while in possession of material non-public information that the stock price was artificially inflated. Karin Gardner was granted approximately 15,000 shares of Impath stock in stock options over the same period. Also, from 2000 to 2002, Torres received at least $85,000 in performance bonuses and Gardner received at least $33,500 in performance bonuses.

### KPMG's Disregard of "Red Flags"

83.     This is not merely a case where KPMG failed to follow prescribed audit steps in performing its audits of Impath. Instead, this is a case whereby KPMG intentionally and/or recklessly chose to ignore obvious "red flags" that Impath's financial condition was being improperly reported.

84.     First, KPMG consciously and/or recklessly ignored the gross inadequacy of the Impulse system it had created. KPMG knew that the Impulse system did not properly report the aggregate value of accounts receivable and the allowances for contracted services and bad debts. KPMG had special insight into Impath's inner workings as it had designed the accounts receivable system and was intimately familiar with the Impulse system. Nonetheless, KPMG consciously or recklessly failed to ensure that these deficiencies in the Impulse system

were corrected or that adequate audit steps were taken to ensure that the accounts receivable were not materially misstated.

85.     Second, KPMG's audit partner, Corey Temple, consciously and/or recklessly disregarded an explicit warning from a member of KPMG's audit team that "based on the recent behavior of Karin Gardner and Ken Jugan [two of the Impath Criminal Defendants], I believe that Impath is hiding something related to the AR [accounts receivable]." Despite this warning issued in connection with the audit of Impath's December 31, 2002 financial statements, KPMG failed to take steps to ensure that the company's accounts receivable were not materially misstated.

86.     Third, KPMG consciously and/or recklessly ignored the significant increases in the company's fixed and intangible asset accounts that lacked any rational business explanation, and failed to substantiate the appropriateness of those increases. For example, the GeneBank intangible assets account increased by more than 200% in a one-year period from $5 million at year-end 2001 to $18 million at year-end 2002. Similarly, the fixed assets increased from $78 million in 2000, to $114 million in 2001, and to $140.8 million at year-end 2002.

87.     Fourth, KPMG consciously and/or recklessly ignored the risks associated with the existence of at least five different accounting systems for multiple operating entities that were acquired by Impath and the failure of the Impulse system to reconcile to the general ledger. As a result, the company's financial reporting and accounting personnel needed to post numerous manual entries, which allowed the creation of unsupported topside entries by individuals seeking to misstate financial information.

88.     Fifth, KPMG consciously and/or recklessly ignored the topside adjustments to the company's general ledger that were clearly identified as unusual and

unsupported entries by the Impath Criminal Defendants. Even a superficial review of the general ledger by KPMG would have identified the roughly $24 million in unsupported topside entries that were clearly identified as "per P.T. adjustments" in both 2001 and 2002, most or all of which were booked as of the last date of a financial quarter. The fact that Peter Torres was unilaterally adjusting the general ledger for such significant amounts should have prompted KPMG to ask for an explanation and obtain competent evidential support for the adjustments. Instead, KPMG simply ignored this red flag.

89.     Sixth, KPMG consciously and/or recklessly ignored the magnitude of the accounting misstatements. Revenues and income before taxes for the year-ended December 31, 2002 were overstated by $22.8 million and $32.8 million, respectively. Similarly, revenues and income before taxes for the year-ended December 2001 were overstated by $26.3 million and $31.3 million, respectively. Thus, while income before taxes was reported as $19.5 million in 2001 and $18.4 million in 2002, the restated loss was actually $11.8 million in 2001 and $14.4 million in 2002. The size, variety and material nature of the undisputed GAAP violations indicate that KPMG fell significantly short of an audit in accordance with GAAS.

90.     Seventh, Impath experienced extraordinary turnover in the ranks of its senior financial personnel. Among other things, the company had three chief/principal financial officers within one year. David Cammarata was the CFO until April 2002 when his employment was suddenly terminated. From April through October 2002, Torres acted as "principal financial officer." Then, from October 2002 on, James Agnello was Impath's CFO. This rapid turnover in Impath's senior ranks should have served to notify KPMG of the instability in the company's financial reporting function.

91.     Eighth, KPMG ignored investigations into Impath's alleged improper
billing practices by the United States Attorney's Office which commenced in January 2000 and
resulted in a $9 million settlement with the government in October 2001.  The criminal
investigation into accounting practices – and its subsequent settlement – should have prompted
KPMG to determine whether Impath's billing practices resulted in inaccurate reporting of
financial results.

92.     Ninth, KPMG consciously and/or recklessly disregarded questions raised
by securities analysts and addressed in the press concerning Impath's revenue growth.
Specifically, as reported in the Wall Street Journal on April 5, 2002, an analyst from Bank of
America Securities contended that the company was "inflating revenue" by "overestimating the
amount of money it can collect for tests billed to some patients."  The article went on to quote
the analysts' comments that Impath's billing practice "makes little sense, considering that it
knows that some patients pay slowly and others not at all."  The statements made by a credible
news service should have notified KPMG of the questionable accounting practices that resulted
in a material overstatement in accounts receivable and net income.

93.     Finally, KPMG consciously and/or recklessly ignored failures by the
company's financial reporting and accounting personnel to provide requested documentation.
Specifically, on the rare occasion that KPMG asked for supporting documentation, it was not
provided.  In addition to not following up on its requests or noting the lack of cooperation,
KPMG failed to advise the Audit Committee or Board of Directors of the situation.  To the
contrary, KPMG notified the Audit Committee that "we encountered no serious difficulties in
working with management in performing our audit."